Meyer v Gannett

United States District Court for the Northern District of Illinois

ANN MEYER

Plaintiff

v

GANNETT COMPANY INC.
(formerly called GateHouse Media and
New Media Investment Group)

Defendant

1:22-cv-04299
Judge Sharon Johnson Coleman
Magistrate Judge Jeffrey Cummings
RANDOM

Ann Meyer
Pro Se
3308 Central St.
Evanston, IL 60201
ameyerwrtr@aol.com
annmeyerann@gmail.com
Cellphone: 847-271-0177

Temporary address:
425 6th Ave., Apt. 2
Menominee, MI 49858

Harter Secrest & Emery LLP
/s/ Robert C. Weissflach
50 Fountain Plaza, Suite 1000
Buffalo, NY 14202
RWEISSFLACH@HSELAW.COM
Direct dial: 716/844-3707

**RECEIVED**

AUG 15 2022

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

**COMPLAINT**

NOW COMES PLAINTIFF Ann Meyer, *pro se*, and brings forth a Complaint against DEFENDANT Gannett Company Inc., and in the pursuit of justice states the following:

Discrimination can take many forms. No one should be bullied or harassed by their employer or co-workers at the workplace nor expected to work in contaminated conditions.

Several laws protect workers from repeated exposure to a toxic work environment, and the word "toxic" also has several meanings. It can mean poisonous, where it affects employees' physical health, or it can mean abusive, where it affects employees' emotional wellbeing and creates an untenable situation that often prompts employees to leave the company sooner than expected.

For the PLAINTIFF and others with disabilities affecting their ability without assistance to lead a normal life, employment laws are even stronger. Employees aren't required to announce their disabilities, due to

Meyer v Gannett

privacy considerations, but they are protected from discriminatory practices in employment, including retaliation, which can take many forms, such as blacklisting the employee from other opportunities.

The Americans with Disabilities Act of 1990 is the federal law that bars employers from discriminating against people with disabilities, including discriminatory termination, failure to hire and retaliation. This law also requires employers to provide reasonable accommodations unless they cause undue hardship.

The ADA was amended in 2008 to broaden the definition of disability and the ADA Amended Act of 2008 (ADAAA) affords many of the same protections as the ADA but qualifies more people.

These laws exist because in the United States of America, we don't punish people for having disabilities.

> The Americans with Disabilities Act of 1990 states, ADA 1990, SEC. 12101. [Section 2a](7), "the Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals; and
>
> [Section 2a](8), the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our free society is justifiably famous, and costs the United States billions of dollars in unnecessary expenses resulting from dependency and nonproductivity.

Our laws are designed to allow those with disabilities to participate in society to the same extent as people without disabilities. That's the goal of the Americans with Disabilities Act of 1990 (ADA) and the Americans with Disabilities Act Amended Act of 2008 (ADAAA).

Few people want to be handicapped or disadvantaged. Most people want to live productive lives and be able to support themselves. People with disabilities often don't talk about their disabilities because doing so might lead to more discrimination. A certain percentage of people seem to enjoy poking fun at other people with weaknesses. This form of bullying apparently energizes them or elevates their own stature because it makes them feel superior. The PLAINTIFF has observed this over and over and over in people in all professions and walks of life, from doctors and lawyers to supervisors.

Other people, such as professional colleagues, members of organizations and hiring managers, exclude people with disabilities because they don't feel comfortable around them. This exclusion and segregation is illegal.

2

Meyer v Gannett

The plaintiff doesn't want to be known for her disabilities, nor is she seeking Social Security disability benefits. She is seeking access and relief from ongoing discrimination and unfairness. Most people want to do their best and celebrate their successes. Who really wants to talk about their weaknesses? Yet the plaintiff is bringing this complaint because the discrimination she faced from her previous employer, Gannett, the DEFENDANT, was egregious, harmful and so uncalled for as to require the DEFENDANT to be called out for their violations of the law, taken to task and held accountable.

The PLAINTIFF's disabilities won't qualify her for Social Security benefits because she's able to work with them with accommodations, most of which she takes responsibility for herself, such as medication for medical conditions, special care to avoid environmental contaminants and other allergens that can trigger an asthma attack, and through the use of devices, extra time and apologies for language issues involving cognitive or "mental" disabilities. The law says an employer shouldn't harass her or discriminate against her for having these disabilities, yet the DEFENDANT did so aggressively. The PLAINTIFF felt her life was in danger and she wasn't exaggerating.

> The Americans with Disabilities Act of 1990, SEC. 12112 [Section 102a] states, "No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."

> The Act defines discrimination [Section 102a1] as, "limiting, segregating, or classifying a job applicant or employee in a way that adversely affects the opportunities or status of such applicant or employee because of the disability of such applicant or employee."

> Discrimination also includes [ADA of 1990, SEC. 12112 (Section 102b3)], "utilizing standards, criteria or methods of administration that have the effect of discrimination on the basis of disability or that perpetuate the discrimination of others who are subject to common administrative control." This means managers and corporate systems shouldn't be allowed to discriminate.

The PLAINTIFF's compound medical disability can be fatal. It involves four separate but related conditions affecting respiratory and cardiovascular health: 1) asthma, 2) a chronic sinus condition involving nasal and sinus polyps that constrict her ability to breathe freely through her nasal passages, 3) allergies to many natural and manmade substances, including chemicals and additives found in common products, such as perfume, paint and some foods and alcohols, and 4) a lack of sense of smell. Her symptoms can include wheezing, shortness of breath and difficulty breathing; sneezing, coughing and congestion in her nose, sinuses, chest and throat; difficulty speaking; cardiac issues stemming from lack

Meyer v Gannett

of oxygen; headaches and other pains; occasional dizziness and lightheadedness; digestive issues related to allergens; and inability to smell odors and scents.

Together, these put the PLAINTIFF at extremely high risk when chemical contaminants or other allergens are present in the environment, as they were in 2019 and 2020. The plaintiff's lack of smell may delay her from leaving a dangerous environment and her body's reaction to the allergens or chemical contaminants can constrict the bronchial airways and trigger an asthma attack at the same time polyps in her nasal passages and sinuses can constrict breathing through her nose and lead to a cardiac event due to oxygen deprivation. When she suffered a medical illness after exposure to chemicals in the workplace in 2019 and injuries from a Dec. 26, 2019 car wreck, another medical issue involving scoliosis, muscular weakness, osteoporosis and skeletal issues also contributed to fatigue and prolonged the PLAINTIFF'S recovery.

Besides her medical disabilities, the PLAINTIFF has cognitive disabilities affecting language, stemming from a working memory weakness. She doesn't speak aloud as well as she writes. She has difficulty learning a new or foreign language, particularly speaking it. Even when speaking her native language of English, she often "trips over her words" and might choose the wrong word or name when speaking aloud, such as saying "Burger King" when she means "McDonald's," "April" when she means "August" or "left" instead of "right." She often corrects herself after a time delay. She also struggles to read her handwriting and typed notes, because her brain doesn't process the formation of words as quickly as she hears them, so her notes often are difficult to decipher. Yet the copy she produces for publication is often flawless, without typos, spelling or grammar errors because with a little extra time, she can compensate for those weaknesses. This might be the reason she loves to write. It's her strength, and she is a highly productive journalist. The PLAINTIFF also is "gifted," with strengths in many areas. This puts her on the so-called "spectrum," with strengths in some areas and weaknesses in others.

The plaintiff's strengths in the written word make her a highly capable writer of news articles, while her weaknesses in note taking, in learning a hidden language and occasionally in the spoken word can present challenges. The note taking weakness is easily accommodated with recording devices or a laptop computer, which she often provides so as not to cause an undue burden, while the hidden-language disability can make it difficult for her to defend herself.

Without enforcement of the American with Disabilities Act, some companies target people's weaknesses, instead of their strengths, even though this practice is illegal and considered counterproductive to the best interests of the company and society. Individual managers might discriminate against talented people with disabilities to protect their own jobs. As the journalism industry has contracted in recent years and

4

Meyer v Gannett

workforces have been reduced, job insecurity in newsrooms has increased, exacerbating discriminatory practices at employers such as Gannett and GateHouse Media. Newsroom managers are expected to put the organizations' interests above their own personal interests of staying employed at whatever cost while others are downsized, but this doesn't always happen. The PLAINTIFF was the victim of these management issues as her disabilities were used as a way to get her out of the workplace.

The financial decline of the DEFENDANT Gannett, a publicly traded company is illustrated through its financial results, stock price and market capitalization, and this supports the PLAINTIFF'S allegations of chronic mismanagement. One tiny part of this mismanagement was the acute bullying of the PLAINTIFF, but perhaps it's indicative of larger issues that need to be addressed. The stock was trading near its 52-week low of $2.30 on Aug. 4, 2022, when its second-quarter financial results were announced, according to YahooFinance. This compares with a stock price of $11.04 for old Gannett and about $9.89 for New Media Investment Group (an owner of GateHouse Media) in the weeks leading up to the Nov. 19, 2019, acquisition closing, when New Media acquired Gannett for about $1.2 billion.

Administrators' concerns about being downsized from the DEFENDANT'S operations have contributed to disability discrimination at Gannett, including allowing harmful conditions, bullying, harassment, aggressive invasion of privacy, sabotage, retaliation, refusal to allow reasonable accommodations, wrongful termination, and failure to hire. These practices created hostile work environments at Gannett and GateHouse Media so extreme as to include the use of chemical contaminants in the workplace that were poisonous to the PLAINTIFF.

By discriminating against employees with disabilities and encouraging those people to leave the company, these managers – and some colleagues – may gain job security, unless they are called to task for these illegal, discriminatory practices. The DEFENDANT'S egregious practices must be addressed. To fail to address them is to condone them.

In this case, besides the PLAINTIFF's medical disabilities, her language difficulties made it difficult for her to defend herself in the face of ongoing harassment and bullying. Often, the DEFENDANTS used a hidden language or a form of double-speak also known as "the Conversation" to taunt, provoke or exclude her. It felt like she was being punished and bullied.

According to the Equal Employment Opportunity Commission and the Americans with Disability Act of 1990, SEC. 12101. *[Section 2]* (a) Findings, "the Congress finds that:

> **(1)** physical or mental disabilities in no way diminish a person's right to fully participate in all aspects of society, yet many people with physical or mental disabilities have been precluded from

5

Meyer v Gannett

> doing so because of discrimination; others who have a record of a disability or are regarded as
> having a disability also have been subjected to discrimination;
>
> (2) historically, society has tended to isolate and segregate individuals with disabilities, and,
> despite some improvements, such forms of discrimination against individuals with disabilities
> continue to be a serious and pervasive social problem.

The discrimination often affects the individual not only in the workplace, but also in other areas, such as
housing, education, recreation, health services, and legal services.

> 4) individuals who have experienced discrimination on the basis of disability have often had no
> legal recourse to redress such discrimination. ADA 1990, SEC. 12101. *[Section 2a, 4]*

The discrimination takes many forms, most often involving exclusion or disadvantage, such as not being
considered for promotions or activities. Over time, this results in economic disadvantage. Many people
with disabilities don't realize their full potential in the marketplace.

> (5) individuals with disabilities continually encounter various forms of discrimination, including
> outright intentional exclusion, the discriminatory effects of architectural, transportation, and
> communication barriers, overprotective rules and policies, failure to make modifications to
> existing facilities and practices, exclusionary qualification standards and criteria, segregation, and
> relegation to lesser services, programs, activities, benefits, jobs, or other opportunities. ADA
> 1990, SEC. 12101. *[Section 2a, 5]*.

In the case of the PLAINTIFF with both medical disabilities and cognitive, or "mental," disabilities, they
affect her everyday life. Not only must she be vigilant in avoiding allergens or contaminants likely to
affect her physical health, she also struggles to keep up with the hidden language used in the so-called
"Conversation," which she recently has discovered drives some people's words and behavior. The more
people use a hidden language with more than one meaning, the more the PLAINTIFF is disadvantaged
because she generally uses plain English to communicate, not a code or double-speak. Sometimes
so-called Conversationists don't understand what she's saying until they realize she is speaking or writing
in plain English. Aside from difficulty understanding this hidden language and her slight spoken-word
weakness, she has mastered the English language. Her ability to communicate and explain complicated

6

Meyer v Gannett

topics in writing often is off the charts. Because of this, she is considered "gifted" or "talented" as a writer but having disabilities.

The PLAINTIFF's language disability makes her a target for bullying, and her reputation was affected at DEFENDANT Gannett when administrators poked fun at the PLAINTIFF using the Conversation possibly for their amusement or possibly to encourage her to leave to protect their positions. While bad jokes, teasing, taunting, slander and other forms of passive-aggressive provocation might be humorous on a late night comedy show, they are offensive in the workplace and create a hostile work environment. They're also counterproductive.

The DEFENDANT's discriminatory practices used against the PLAINTIFF restricted her progress, despite the fact she had helped her employer -- and society as a whole -- through the work she was producing as a journalist, specifically as an education reporter. She should have been allowed to continue in her employment. Instead she was denied the opportunity to continue working, excluded from her position when she was wrongfully terminated, and blacklisted from countless other opportunities at GANNETT in violations of the ADA and ADAAA. Without other journalism opportunities afforded to her during the pandemic, the PLAINTIFF obtained a commercial driving license in 2020 and drove a school bus and served as a school safety monitor during lunch and recess during COVID-19, which she and her family determined to be unacceptable given her experience, level of advanced education and service to journalism over a 40-year period. She did this while waiting for another opportunity in journalism and for the Equal Employment Opportunity Commission's Notice of Right to Sue, which she received May 18, 2022, about two years after the DEFENDANT'S wrongful termination and other discriminatory acts. The PLAINTIFF doesn't expect to pursue school bus driving in the future.

The PLAINTIFF has stated on numerous occasions she wants to be a productive member of society and doesn't wish to be a burden.

With disability discrimination pervasive, people often have more than one disability but are reluctant to speak of them. Still, they need support because they so often are economically disadvantaged.

The ADA was broadened under the Americans with Disabilities Act Amendments Act of 2008 (ADAAA), which states:

> "the limitations from the impairment no longer must be severe or significant for the impairment to be considered substantially limiting, or that the employer perceive the impairment to be substantially limiting." People with disabilities aren't to be retaliated against, harassed or terminated for having one or more disabilities.

7

Meyer v Gannett

This complaint describes how the PLAINTIFF was physically injured, emotionally abused and severely economically disadvantaged by the DEFENDANT'S unwillingness to adhere to disability laws and its decision to terminate employment and blacklist the employee from future opportunities in violations of the law. The PLAINTIFF made extraordinary efforts to overcome her limitations, yet the DEFENDANT used them against her and took incredible advantage of her, her extensive education and her decades of experience and sweat equity in the practice of journalism as an independent journalist in Chicago. This occurred out of corporate greed and abuse of power.

## NATURE OF THE ACTION

The PLAINTIFF brings forth this action for injunctive, equitable, compensatory, declaratory and punitive relief from the DEFENDANT'S discriminatory acts, which are in violation of the American with Disabilities Act of 1990 (ADA) and of the Act as amended in the ADA Amendments Act of 2008 (ADAAA) and other laws the DEFENDANT allegedly violated that also could have contributed to discrimination and retaliation.

Injunctive relief: In so much as the DEFENDANT has continued to exclude the PLAINTIFF from employment for no reason other than the PLAINTIFF'S disabilities and unlawful retaliation and discrimination, the DEFENDANT seeks injunctive relief in the form of a court order enjoining the DEFENDANT from these unlawful activities, such as blacklisting.

Equitable relief: In so much as the DEFENDANT is the nation's largest print and digital news company, the PLAINTIFF seeks equitable relief to determine a fair resolution.

Compensatory damages: In so much as the DEFENDANT's failure to adhere to the ADA and ADAAA, the PLAINTIFF seeks compensatory damages and expectation damages from its breach of these employment laws and other losses the PLAINTIFF incurred as a result of this dispute and the DEFENDANT's negligence.

The PLAINTIFF also seeks damages in the form of a monetary award for loss and injury.

Due to the nature of this case and the standard in the legal realm of attorneys taking on the legal costs upfront in Wrongful Termination cases such as this, the PLAINTIFF is seeking equitable relief in legal fees during the litigation, not just at the end. The PLAINTIFF has received responses from a number of attorneys she has contacted for legal help who say they don't have the bandwidth to take on this case. This means many attorneys don't feel they can carry the costs of the litigation during the process. She imagines this is because the DEFENDANT is a large, publicly traded company with deep pockets and can stall as a tactic to wear down the PLAINTIFF, yet this would be unjust. The PLAINTIFF is the victim injured on the job, harassed, bullied and wrongfully terminated, despite outstanding performance, and a

Meyer v Gannett

fair legal system wouldn't expect her to pay the costs upfront. Nor should she be denied the Right to Sue presented to her.

The U.S. Constitution, under the 6th Amendment, provides for the assistance of counsel in all criminal prosecutions. The PLAINTIFF isn't a criminal. She is a victim of limited means because she lost her job due to discrimination. Why should she be treated worse than an alleged criminal? With all due respect of the lawyers' compensation standard, the PLAINTIFF seeks this court's assistance in her desire for legal representation by allowing for her legal fees to be paid prior to the end of the litigation.

The PLAINTIFF has attempted to resolve this matter on her own without success. She also approached attorneys to seek assistance through negotiation, but was told she would be better off finding a litigator.

Several attorneys contacted have said they didn't have time this summer to take on this case and encouraged her to file *pro se* to extend her right to sue and then contact them. The PLAINTIFF believes an order from this court allowing for relief from legal costs will allow her to retain an attorney in this matter in the near future.

The PLAINTIFF brings this action pursuant to the ADA and ADAAA, to enjoin such discriminatory acts as failure to hire, harassment, defamation and blacklisting from employment opportunities, and to obtain declaratory and punitive relief from such discriminatory practices as harassment, retaliation and wrongful termination, and to obtain immediate declaratory relief in the form of legal assistance to carry this COMPLAINT forward so justice can be served.

## JURISDICTION AND VENUE

The United States District Court for the Northern District of Illinois has jurisdiction over this action pursuant to the Americans with Disabilities Act of 1990 and the Americans with Disabilities Act Amendments Act of 2008 (ADAAA) which effective Jan. 1, 2009, broadened the definition of disability. Jurisdiction of the Court exists in that this action arises under federal laws, and on May 18, 2022, the Equal Employment Opportunity Commission provided the PLAINTIFF with a "Notice of Your Right to Sue." The NOTICE OF YOUR RIGHT TO SUE letter states, "Your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days."

Venue is proper in the Northern District of Illinois Circuit Court as, during Illinois Gov. J.B. Pritzker's Stay-at-Home Order of 2020 during COVID-19, the PLAINTIFF was complying with the order and staying at her home in Evanston, Illinois, while employed by DEFENDANT Gannett at the time of the Discrimination. Certain of the acts, practices and courses of business constituting violations of the federal

Meyer v Gannett

Americans with Disabilities Act of 1990 (ADA) and Americans with Disabilities Act Amended of 2008 (ADAAA) alleged herein occurred within the Northern District of Illinois Circuit Court's area.

## THE PLAINTIFF

PLAINTIFF Ann A. Meyer was born in Chicago, raised in Oak Park and has lived in the Chicago area for over 55 years.

PLAINTIFF is divorced and supports herself.

PLAINTIFF is a professional journalist. She is not an attorney.

PLAINTIFF was an employee of DEFENDANT Gannett Company Inc., formerly GateHouse Media, from June 4, 2018 to March 31, 2020, at which time she was wrongfully terminated because she wasn't provided with the same work arrangements other employees were.

PLAINTIFF has qualified medical disabilities, involving asthma, a chronic sinus condition that constricts her ability to breathe through her nose, allergies and lack of sense of smell.

PLAINTIFF also has qualified cognitive or "mental" disabilities.

PLAINTIFF'S disabilities caused her to take a Family and Medical Leave Act (FMLA) leave from DEFENDANT Gannett in late November 2019.

PLAINTIFF was living at her Evanston residence at the time certain of the acts and practices violating federal laws alleged herein occurred, including the ADA's prohibitions of Discrimination, Retaliation, Termination and Failure to Hire.

PLAINTIFF's FMLA leave expired at the end of February 2020.

PLAINTIFF continued to be employed through March 31, 2020 in Evanston.

PLAINTIFF is a member in good standing of the Society of Professional Journalists.

PLAINTIFF is a member in good standing of Association of Women Journalists-Chicago, a nonpartisan, not-for-profit supporting women in journalism and promoting the respectful treatment of women by the news media.

PLAINTIFF is a member in good standing of Authors Guild, the nation's oldest and largest professional organization of writers.

PLAINTIFF received the best-in-the-nation journalism award and Lifetime National Honors in Journalism from Quill & Scroll, an honorary society recognizing initiative and achievement in scholastic journalism, in May 1981, the year she was Editor-in-Chief of Oak Park-River Forest High School's student newspaper, giving her a hat trick of national awards.

PLAINTIFF was part of the newspaper staff that won the American Society of Newspaper Editors' top national honor, the "All-American" prize, two years in a row prior to the Quill & Scroll designation.

Meyer v Gannett

PLAINTIFF received the honor of a "done diploma" from Northwestern University, conferred with her bachelor of science in journalism degree in 1985.

PLAINTIFF studied the field of journalism as a member of the editorial team producing *Byline, Northwestern's Journalism Review*, starting in 1982 and serving as the editor in 1984 and has continued to study the evolution and decline of the industry since that time.

PLAINTIFF began working in the profession of journalism in 1982 while employed by Pioneer Press and the Evanston Review.

PLAINTIFF worked as a journalist either on staff or through her business, serving newspapers, magazines, newsletters and websites based in Buffalo Grove, Glenview, Chicago, Evanston, Oak Park and Deerfield over a period of about four decades.

PLAINTIFF worked as associate editor at Mature Outlook magazine and newsletter from 1986 to 1988 in Glenview and Buffalo Grove as an employee of Allstate Enterprises, until the company closed the publishing arm and outsourced the publications to Meredith Publishing.

PLAINTIFF launched Ann Meyer Communications in 1988 after Meredith Publishing asked her to provide the content for Mature Outlook Newsletter.

PLAINTIFF served Maxwell Sroge Publishing as editor of Nonstore Marketing Report and The Catalog Marketer for about a decade, starting in 1991 and ending in 2001.

PLAINTIFF wrote regularly for the Chicago Tribune for about eight years from October 2002 to January 2011 and launched two standing columns, "Minding Your Business" and "On the Job," for the Business section through an agreement in which she retained the copyright.

PLAINTIFF created an original business plan in 2009 and in July 2010 launched SmallBizChicago.com, a news site on small business, after the Chicago Tribune changed the focus of her column from small business to workplace issues.

PLAINTIFF received Lifetime International Honors in business and was inducted into Delta Mu Delta, an honor society that recognizes academic excellence among business majors, in 2010.

PLAINTIFF was let go from the Chicago Tribune in January 2011 and falsely accused of starting a competing media business, despite having served the Tribune through her business for eight to 12 years.

PLAINTIFF enrolled in North Park University's School of Business & Nonprofit Management in August 2008, with hopes of elevating her career, and received a master's degree with distinction in 2011.

PLAINTIFF served as senior editor from 2011 to 2013 at Retail Leader, a new publication started by Stagnito Media that borrowed from her business plans. She earned $77,000 in revenue in 2013.

PLAINTIFF continued to create articles on a per-article-basis for Retail Leader until publication of the May 2017 issue while working full-time in temporary writing and editing positions in Chicago, which did not offer health insurance.

PLAINTIFF served nonprofits and community organizations in Illinois as a volunteer for over 25 years, including serving on an advisory board to North Park University's School of Business & Nonprofit Management from 2013 to 2016.

Meyer v Gannett

PLAINTIFF received lifetime international honors in the study of nonprofits and social enterprises and was inducted into Nu Lambda Mu, an honor society established by Nonprofit Academic Centers Council to advance the study of nonprofits and social entrepreneurship, in April 2017.

PLAINTIFF received a full-tuition professional journalism scholarship to DePaul University's Graduate Journalism School and successfully completed graduate journalism courses in digital journalism and radio broadcast in fall 2017 designed to keep her journalism skills current as technology evolved. Aside from some freelance revenue, the PLAINTIFF had no source of income.

PLAINTIFF taught managerial communications as an adjunct instructor at the University of Illinois-Chicago from January to May 15, 2018, but at $12,500 for a 17-week semester, PLAINTIFF wasn't earning enough to make ends meet. As an adjunct, she wasn't provided with health insurance.

PLAINTIFF accepted a full-time position as education reporter at GateHouse Media, now Gannett, in April 2018 for $18 an hour and was required to sign a Consumer Reporting Background Agreement before she could assume the position offered her.

PLAINTIFF'S health declined in fall of 2018, when allergies apparently brought on asthma. She recovered but was prescribed steroids three times in 18 months for asthma, indicating a problem.

PLAINTIFF's health declined again in fall of 2019, when chemical contaminants at work compound her medical condition, particularly her asthma and nasal polyps.

> PLAINTIFF"s important medical dates include the following:
> (Some dates are approximate.)

> **2019**

> November 2019 – PLAINTIFF's health declines after exposure to chemical contaminants and she requests a Family and Medical Leave Act leave.

> About Late November -- PLAINTIFF's primary care internist physician, Dr. Anne Niedenthal of Wilmette sees her related to her medical condition of asthma, sinus condition, allergies and lack of smell.

> About Dec. 19, 2019 -- PLAINTIFF is rushed to Evanston Hospital after chest pains and elevated blood pressure.

> Dec. 26, 2019 – The minivan PLAINTIFF was driving was hit by a car with extreme force and apparently flipped over at an intersection in Evanston.

> Dec. 27, 2019 – X-rays and medical scans show she suffered a broken or badly bruised pelvis in the wreck that totaled her low-mileage 2016 minivan.

> **2020**

> Late December – January 2020 – Nightmares, chest pain, congestion, constricted breathing.

> Jan. 3, 2020 -- Doctor's appointment with Dr. Anne Niedenthal in Wilmette. She referred the PLAINTIFF for physical therapy.

> January to February 2019 -- PLAINTIFF participate in six weeks of physical therapy, related to the car accident and chemical contamination.

12

Meyer v Gannett

Jan. 20, 2020 -- During appointment with allergist Dr. Giselle Mosnaim, the doctor tells PLAINTIFF, "You were poisoned!"

February 2020 – PLAINTIFF felt tingling in her arms and sought medical advice out of concern it was angina. Breathing is constricted.

Feb. 19, 2020 – PLAINTIFF sees Ear-Nose-Throat Dr. Steven Charous now at Loyola University Medical Center and is recommended for surgery to remove polyps but wants to hold off due to Covid-19. He prescribes new medication and recommends PLAINTIFF see a cardiologist.

Mid-February -- PLAINTIFF received notice from Gannett saying health care benefits would end at the end of the month. Patient opted or COBRA.

About Feb. 23, 2020 -- PLAINTIFF suffers from what she believes is angina; has to leave the L train due to lightheadedness; she felt as if she might pass out.

About March 3 or 4, 2020 -- PLAINTIFF suffers a cardiac scare, when she woke up feeling lightheaded with chest pain and tingling in her arms. She almost passed out in the shower. She was taken to the Evanston Hospital emergency room in an ambulance for the third time.

March 9, 2020 – PLAINTIFF had appointment with cardiologist Dr. Jordan Harris; her heart is OK; he referred PLAINTIFF for a cardiac stress test.

March 16, 2020 – PLAINTIFF had cardiac stress test; cleared for remote work.

About March 16, 2020 – DEFENDANT denies PLAINTIFF'S request to work remotely, despite COVID-19 shutdown.

March 31, 2020 – PLAINTIFF received termination letter dated March 31, 2020. She was unpaid from January to April 2020.

October 2020 – PLAINTIFF sent to NorthShore Hospital System urgent care appointment for acute sinus issue where both nasal passages are blocked with polyps and her breathing is severely constricted.

Oct. 20, 2020 – PLAINTIFF sees ENT Dr. Ravive at Skokie Hospital who schedules her for surgery.

Oct. 26, 2020 – PLAINTIFF has CT Scan at Evanston Hospital.

Nov. 2 and 9, 2020 – PLAINTIFF has appointments with Wilmette internist Dr. Niedenthal, OKed for surgery.

About Nov. 19, 2020 – PLAINTIFF has sinus surgery at Evanston Hospital.

2021 and 2022 – Recovery effort is ongoing.

## THE DEFENDANTS

DEFENDANT Gannett Company was previously called GateHouse Media or New Media Investment Group until Nov. 19, 2019, when the company acquired another media company known as "old Gannett" and assumed the name Gannett for the newly merged company.

DEFENDANT Gannett Company Inc. is a national public company registered in Delaware with its stock traded on the New York Stock Exchange under the symbol GCI.

DEFENDANT Michael Reed is the Chairman and Chief Executive Officer of Gannett Company Inc. on the date of this writing.

DEFENDANT Reed was the Chief Executive Officer of New Media Investment Group (GateHouse Media) from 2014 to 2019, when it acquired "old Gannett" and took the Gannett name.

DEFENDANT Reed was Chief Executive Officer of GateHouse Media Inc., the predecessor of New Media Investment, from 2006 to 2014.

DEFENDANT Gannett Company describes itself on its corporate website as "a subscription-led and digitally focused media and marketing solutions company committed to empowering communities to thrive."

DEFENDANT Gannett is headquartered at 7950 Jones Branch Drive in McLean, VA 22107-0150 (703) 854-6000.

DEFENDANT Gannett owns USA Today and local media outlets in 46 states, including several in Illinois.

DEFENDANT Gannett operates a Chicago office, where at least one journalist was employed during the period in which the PLAINTIFF sought to continue working for Gannett. This office is about 10 miles or 35 minutes from the PLAINTIFF's Evanston townhouse.

DEFENDANT Gannett owns several digital marketing services companies, including ReachLocal Inc., UpCurve Inc. and WordStream Inc.

DEFENDANT Gannett runs an events business called USA TODAY NETWORK Ventures.

DEFENDANT Gannett had a market capitalization of $333.93 million, reflecting the total value of its stock on Aug. 5, 2022.

DEFENDANT Gannett owns the Milwaukee Journal Sentinel in Milwaukee, about 75 miles from Evanston, Illinois.

DEFENDANT Gannett owns the Rockford Register Star at 99 E State St. in Rockford, Illinois, about 85 miles from Evanston, Illinois.

DEFENDANT Gannett owns The State Journal Register, at 421 South Grand Avenue W., Suite 1A, in Springfield, Illinois.

Meyer v Gannett

DEFENDANT Gannett also owned and still owns the Panama City Beach, FL, News Herald, a news outlet the PLAINTIFF assisted for a week in October 2018 in the aftermath of Hurricane Michael, working from a hotel room in Panama City Beach.

DEFENDANT owned the Savannah Morning News newspaper serving Chatham.

DEFENDANT Frankie Fort is a former HR Director.

DEFENDANT Samantha Howland is Chief People Officer for Gannett.

DEFENDANT Mizell Stewart III is Gannett's Vice President of News Performance, Talent and Partnerships.

## ALLEGATIONS AND STATUTES

The Equal Employment Opportunity Commission (EEOC) states, "An individual can meet the definition of disability if an employment action was taken because of an actual or perceived impairment (e.g. refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment)."

The discriminatory conduct in this complaint involves the following actions:

> Failure to hire
> Termination of employment
> Failure to promote
> Failure to provide reasonable accommodations
> Unequal terms and conditions of employment
> Seclusion
> Retaliation
> Coersion
> Interference
> Invasion of privacy
> Unfair pay.

Many of the allegations of discrimination are ongoing.

This case illustrates how a large corporation preyed upon a Chicago area journalist well known to have a language disability pertaining to the Conversation, as illustrated from her use of English language in the present, and in acts of coercion and retaliation also used the force of a chemical contaminant, knowing she also has medical disabilities involving asthma, allergies, a chronic sinus and nasal condition and lack of sense of smell, in its effort to remove her from her position and further disable her, an egregious violation of the ADA and ADAAA.

The PLAINTIFF, a Chicago native and Illinois resident for over five decades was forced to take an unpaid medical leave in the Chicago area in late November 2019, when she became ill after exposure to chemicals or poisons she believes were directly connected to her job at Gannett. The extent of the contamination was frightening as it could have been fatal to the PLAINTIFF, who felt her health

Meyer v Gannett

declining for several months but didn't understand why. Her lack of sense of smell meant she wasn't aware when the newsroom was contaminated. She also doesn't know how much of the chemical or poison she ingested before taking an approved leave in late November 2019 allowed under the Family and Medical Leave Act.

Instead of being allowed to return to work, the DEFENDANT Frankie Fort terminated the PLAINTIFF on March 31, 2020, despite being cleared by medical doctors for remote work at a time when other employees worked remotely.

The termination wasn't the only act of discrimination and retaliation.

The PLAINTIFF was seriously injured in a car accident in Evanston on Dec. 26, 2019, when the minivan she was driving was hit with such force at an intersection that her vehicle toppled over onto its roof, rolled again back on to its wheels and spun around, to the best of the PLAINTIFF'S recollection. She suffered a broken or severely bruised sternum and her van was totaled. While her auto insurance provided a partial payment, the PLAINTIFF paid for her medical care and bought a lesser car. This accident prolonged her unpaid FMLA leave and it likely wasn't an accident.

A few months prior, DEFENDANT HR Director Frankie Fort had approached the PLAINTIFF at her workstation, asked her for her auto insurance card so she could Xerox it, returned the card to her and said, "In six months, you'll be a disabled veteran." The PLAINTIFF isn't a military veteran, nor is she so disabled as to qualify for Social Security disability. The rumor was, Ms. Fort reacted to an article the PLAINTIFF wrote about property tax exemptions provided to disabled veterans and the car wreck occurred because of the Conversation.

Ms. Fort repeatedly told the PLAINTIFF not to mention the newsroom chemicals but to describe the injuries from the car accident when completing paperwork for an employee benefit intended to provide short-term disability. Several weeks after the accident, the PLAINTIFF asked Ms. Fort what she had meant several months earlier when she told the PLAINTIFF, "You'll be a disabled veteran," Ms. Fort responded, "I might have spoken out of turn."

As if the car accident that totaled the PLAINTIFF's minivan wasn't enough, several weeks later, in January 2020, a rental car the PLAINTIFF was driving was hit by a car in an intersection in Wilmette. The impact seemed to be deliberate, according to the PLAINTIFF, though the damage was minor. The PLAINTIFF suspected these accidents could be related to the rumors that DEFENDANT Frankie Fort

16

Meyer v Gannett

allegedly believed the PLAINTIFF deserved government compensation in the form of a military veteran's benefits and sought to have her declared a disabled veteran. This over-reach into the PLAINTIFF'S personal life was reprehensible to the PLAINTIFF, who seeks a healthy, productive and autonomous life, one free from other people's abusive behaviors and practices.

Prior to the PLAINTIFF's termination, the DEFENDANT Gannett excluded the PLAINTIFF repeatedly in ways described below. The DEFENDANT retaliated against the PLAINTIFF when she sought to be released from an agreement that allowed for invasion of privacy. The privacy invasions were used to bully the PLAINTIFF by preying on her language disability, where she doesn't always understand what's meant in the hidden language and can't adequately respond or defend herself from assaults from Conversationalists, such as the assertion she would become a disabled veteran.

The PLAINTIFF had been unaware of how the Conversation transpired prior to her work for the DEFENDANT, though observing anecdotally how other people seemed to be using her personal information and ideas without permission. The privacy violation confronted her daily in the workplace, and she didn't understand why the DEFENDANT allowed it to occur. The problem was present at the PLAINTIFF'S Evanston townhome while she was employed and recovering. The PLAINTIFF continued to experience harassment and bullying on a regular basis in 2020 while being excluded from work opportunities.

In the over two years since the PLAINTIFF was terminated as of this writing, the DEFENDANT has failed to rehire her, despite dozens of applications and personal visits to meet with other executive editors.

The question is, why did the company continue to discriminate? The reasons won't change the fact the company discriminated against her, but they help to explain what the PLAINTIFF went through. She was retaliated against from the get-go based on her disabilities and for being aware of the DEFENDANT'S ongoing aggressive invasions of privacy and protesting the practice.

In April 2018, the DEFENDANT told the PLAINTIFF she was required to sign a Consumer Reporting Background Agreement before she could assume the position offered her. The PLAINTIFF raised several issues with this document and offered to sign a modified agreement, but the DEFENDANT wouldn't allow it.

The PLAINTIFF believes this request and the agreement itself was discriminatory in nature as other employees weren't asked to sign this agreement. She would learn over a period of months the

17

Meyer v Gannett

DEFENDANT was using information obtained through surreptitious means about her in the
Conversation, some of which was incorrect, and asking questions about her and her acquaintances and
relatives. The PLAINTIFF felt bullied.

Why did the PLAINTIFF put up with it? She needed a job. The PLAINTIFF is an experienced
professional journalist and also has expertise in business and nonprofits, acquired through her own
experience of running a media services company for 30 years and through graduate school, but the media
industry was contracting and companies were laying off workers. Most of the knowledge the PLAINTIFF
gained through her years of experience was "sweat equity" because she paid for it through her own
resources, time and dedication. As she grew older and the industry declined, she sought employment at
Gannett for the stable paycheck and benefits, including health care insurance.

The invasion of privacy created a hostile work environment, not just for the PLAINTIFF but also for
other journalists. This invasion of privacy is ongoing, and the retaliatory discrimination includes
exclusion, failure to hire, and theft of intellectual property and violations of journalism standards.

## ADA Definition of Disability

The Americans with Disabilities Act of 1990, Sec. 12102 [Section 3, 2A] states the term
disability "means a physical or mental impairment that substantially limits one or more major life
activities of such individual; a record of such impairment; or being regarded as having such an
impairment....Major life activities include, but are not limited to, caring for oneself, performing
manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking,
breathing, learning, reading, concentrating, thinking, communicating, and working....An
individual meets the requirement of 'being regarded as having such an impairment' if the
individual establishes that he or she has been subjected to an action prohibited under this chapter
because of an actual or perceived physical or mental impairment whether or not the impairment
limits or is perceived to limit a major life activity."

## ADAAA Broadens the Definition of Disability

The ADAA has updated this definition, stating, "In addition to activities such as performing
manual tasks, walking, seeing, hearing, speaking, breaking, learning, thinking, concentrating,
reading, bending, and communicating, major life activities now include the operation of major
bodily functions, such as function of the immune system, special sense organs and skin, normal
cell growth, and digestive, genitourinary, bowel, bladder, neurological, brain, **respiratory,**

Meyer v Gannett

circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions, or the operation of an individual organ within a body system."

The length of time the disability affects the person can vary. The ADAA states, "An impairment may be substantially limiting even though it lasts or is expected to last fewer than six months."

Disabilities don't have to be present every day for someone to have a qualified disability, according to the American with Disabilities Act. The ADA and the amended ADAAA state someone can have a physical or mental impairment, a recording of this substantially limiting impairment or be regarded as having a disability.

Besides the invasion of privacy, the health issue the PLAINTIFF developed from chemicals ingested in the newsroom prior to requesting a Family and Medical Leave Act leave in late November 2019 was compounded by a medical disability she's had most of her life. Injuries the PLAINTIFF sustained in the Dec. 26, 2019 car wreck delayed her recovery. Her medical disability worsened at the end of the year, and she had surgery in November 2020, a full year after she took the FMLA leave.

## The Statutes

The DEFENDANT'S discrimination and retaliatory acts took several forms and violated a number of regulations within the Americans with Disabilities Act.

**Methods of Administration discrimination**

The PLAINTIFF was discriminated against based on the DEFENDANT'S methods of administration, when administrators:

- allowed for a chemical contaminant in the workplace, despite knowing the PLAINTIFF had asthma, allergies and other medical conditions;

- told some employees to clear out of the workplace, while failing to inform the PLAINTIFF on numerous occasions of the use of a chemical in the workplace;

allowed the Executive Editor to tell the PLAINTIFF to pack up her belongings, and put them in a POD for storage, instead of addressing the contaminated newsroom and other issues;

- told the PLAINTIFF, "In six months, you'll be a Disabled Veteran," without discussion and while Xeroxing her auto insurance card, foreshadowing a serious car accident Dec. 26, 2019 where the PLAINTIFF sustained injuries;

Meyer v Gannett

- acted on the assumption the PLAINTIFF would qualify as a disabled veteran, and sought to further the DEFENDANT'S desire for the PLAINTIFF to be disabled, working against the PLAINTIFF's interests and Gannett's;

- used a hidden language as a means of communication as a way of excluding the PLAINTIFF from the discussion;

- allowed for the so-called "Conversation" involving a hidden language of "double-speak" to continue on a daily basis, often containing information or language directly related to the PLAINTIFF or her background;

- harassed or bullied the PLAINTIFF through the use of this hidden language, which often included personal information the PLAINTIFF did not wish to share.

According to the ADA of 1990 SEC. 12112. *[Section 102]* (b) As used in subsection (a) of this section, the term "discriminate against a qualified individual on the basis of disability" includes (3) utilizing **standards**, criteria, or **methods of administration** (A) that have the effect of discrimination on the basis of disability; (B) that perpetuate the discrimination of others who are subject to common administrative control.

### Exclusion

The PLAINTIFF was excluded from working, after another person was hired for her position in early 2020 and no other position was offered to the PLAINTIFF.

The PLAINTIFF was excluded from working for Gannett at a time when all employees were told they should be working remote from the newsrooms. Chief Executive Officer Michael Reed or another key executive of Gannett said in a virtual staff meeting in early 2020, no one should be working in the newsroom, due to COVID-19. The PLAINTIFF was allowed to participate in this virtual meeting, but wasn't invited to others.

When the PLAINTIFF's work email address was shut down, she was excluded from other staff meetings.

The DEFENDANT also barred the PLAINTIFF from speaking with Executive Editor Susan Catron.

The PLAINTIFF was locked out of Gannett's career portal, where job opportunities are posted, when the system wouldn't take her log-in information and wouldn't allow her to reset her password in 2020. This was corrected after the PLAINTIFF contacted Investor Relations.

The PLAINTIFF was excluded from training sessions for a new software system in early 2020.

Meyer v Gannett

These are violations of the ADA of 1990 and ADAAA of 2008, which states:

> ADA of 1990: Discrimination SEC. 12112. *[Section 102]*(a) General rule: No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

**Limited and classification violations**

The PLAINTIFF was limited in a way that adversely affected the opportunities and status afforded her when the DEFENDANT failed to allow her to work and failed to hire her for other suitable positions. Considering her extensive experience, education and training, she was highly qualified for most editorial positions in the company. This is a violation of the ADA and the ADAA.

> According to the ADA of 1990 SEC. 12112. *[Section 102]* (b) As used in subsection (a) of this section, the term "discriminate **against a qualified individual on the basis of disability"** includes (1) **limiting**, segregating, or **classifying a job applicant** or employee in a way that **adversely affects the opportunities** or status of such applicant or employee because of the disability of such applicant or employee.

**Reasonable accommodations**

The PLAINTIFF requested in December 2019 and early 2020 to resume work remotely on a part-time, hourly basis while recovering from injuries sustained due to a contaminated work environment, and this request for reasonable accommodations was denied. This was at a time when other employees were working remote from the newsroom. The PLAINTIFF believes she was retaliated against for complaining about the chemicals in the newsroom and the invasion of privacy. These are violations of the ADA and ADAAA.

> According to the ADA of 1990 SEC. 12112. *[Section 102]* (5) (A) The term "discriminate **against a qualified individual on the basis of disability"** includes not making **reasonable accommodations** to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity.

Meyer v Gannett

**Denial of compensation**

The PLAINTIFF was denied compensation when the DEFENDANT denied her request to at least work part time during her recovery from a chemical contamination in the workplace.

This is a violation of the ADA of 1990 and the ADAAA of 2008.

> ADA of 1990: Discrimiation SEC. 12112. *[Section 102]*(a) General rule. - No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, **employee compensation**, job training, and other terms, conditions, and privileges of employment.

**Wrongful termination**

The PLAINTIFF should not have been terminated. She was discharged because of her disabilities. This is a violation of the ADA and the ADAAA:

> ADA of 1990: Discrimination SEC. 12112. *[Section 102]*(a) General rule: No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or **discharge of employees**, employee compensation, job training, and other terms, conditions, and privileges of employment.

> The ADAAA has broadened the definition of disability.

**The Ledbetter Fair Pay Act of 2009**

The PLAINTIFF was denied fair compensation when the DEFENDANT failed to consider the extent of her experience and training -- and also when the DEFENDANT denied her opportunities to work while recovering and afterward. The DEFENDANT also denied her employment without cause, based on her disabilities.

The employer could have promoted her in 2019 when it posted and she applied for a higher-paying education reporter position but declined to or when she applied for various editor positions in 2020.

This is a violation of the Lilly Ledbetter Fair Pay Act, which includes a modification of the Americans With Disabilities Act of 1990, to clarify that: "a discriminatory compensation decision or other practice that is unlawful under such Acts occurs **each time compensation is paid** pursuant to the discriminatory compensation decision or other practice, and for other purposes."

The "Lilly Ledbetter Fair Pay Act of 2009" extends the amount of time allowed to file for wage and salary discrimination under the ADA Act:

> (3) With regard to any charge of discrimination under any law, nothing in this Act is intended to preclude or limit an aggrieved person's right to introduce evidence of an unlawful employment practice that has occurred outside the time for filing a charge of discrimination.
> https://www.govinfo.gov/content/pkg/PLAW-111publ2/html/PLAW-111publ2.htm

> (a) Americans With Disabilities Act of 1990.--The amendments made by section 3 shall apply to claims of discrimination in compensation brought under title I and section 503 of the Americans with Disabilities Act of 1990 (42 U.S.C. 12111 et seq., 12203), pursuant to section 107(a) of such Act (42 U.S.C. 12117(a)), which adopts the powers, remedies, and procedures set forth in section 706 of the Civil Rights Act of 1964 (42 U.S.C. 2000e-5).

**Fair Labor Standards Act**

The PLAINTIFF, a nonexempt wage earner, also was the victim of Fair Labor Standards Act violations regarding hours worked and overtime pay for working over 40 hours a week. These violations also could be related to her disabilities, as Gannett managers were aware of this and chose not to correct it.

> According to the U.S. Department of Labor, the Fair Labor Standards Act for overtime states, "covered nonexempt employees must receive overtime pay for hours worked over 40 per workwork (any fixes and regularly recurring period of 168 hours or seven consecutive 24-hour periods) at a rate not less than one and one-half times the regular rate of pay. There is no limit on the number of hours employees 16 years or older may work in any workweek. The FLSA does not require overtime pay for work on weekends, holidays or regular days of rest, unless overtime is worked on such days."

The PLAINTIFF also didn't receive pay for all the hours she worked, often because the computer she used to log in to the timesheet wasn't always functional. This is a violation of the Fair Pay Act's Hours Worked provision.

> The Hours Worked provision provides, "Hours worked ordinarily include all the time during which an employee is required to be on the employer's premises, on duty, or at a prescribed workplace." https://www.dol.gov/agencies/whd/flsa

Meyer v Gannett

**Failure to hire**

The PLAINTIFF was encouraged to contact other offices, HR directors and hiring managers for
employment and apply for positions. She did so, yet was not offered any position.

This is a violation of the ADA of 1990 and the ADAAA of 2008.

> SEC. 12112. *[Section 102]*(a) General rule: No covered entity shall discriminate against a
> qualified individual on the basis of disability in regard to job application procedures, **the hiring**,
> advancement, or discharge of employees, employee compensation, job training, and other terms,
> conditions, and privileges of employment.

**Denying employment opportunities**

The PLAINTIFF was excluded from opportunities and job interviews, due to her disabilities and requests
for reasonable accommodations, including work in another newsroom. Specifically, the Des Moines
Register Executive Editor Carol Hunter said in September 2020 she would speak with the PLAINTIFF
and then rescinded this offer.

The PLAINTIFF drove to Milwaukee, Wisconsin, in late November of early December of 2019 and
spoke with Executive Editor George Stanley and followed up with numerous emails and applications for
various positions in Wisconsin but received no invitation for participation.

The PLAINTIFF drove to Springfield, Illinois, on or about Dec. 11 and spoke to Executive Editor Leisa
Richardson in person and followed up in 2020 but received no further invitation to participate.

The PLAINTIFF spoke with Gannett HR Vice President Mizell Stewart III in person in September 2019
in San Antonio, Texas, while attending a professional journalism conference and was told, "We don't hire
for experience." The PLAINTIFF believes this is an illegal practice, as the law provides for hiring the
most qualified applicant. The PLAINTIFF followed up with Mr. Stewart in 2019 and in July 2020 but
received no invitation to participate.

> The ADA of 1990 SEC. 12112. *[Section 102] prohibits* (B) **denying employment opportunities**
> to a job applicant or employee who is an otherwise qualified individual with a disability, if such
> denial is based on the need of such covered entity to make reasonable accommodation to the
> physical or mental impairments of the employee or applicant.

24

**Selection Criteria and discriminatory considerations**

The PLAINTIFF suspects she was denied employment and other opportunities based on discriminatory consideration of selection criteria that included determining use of a hidden language of double-speak, rather than considering the PLAINTIFF'S view of clear language, which is plain English and does not purposely include a hidden language or double-speak.

The ADA prohibits selection criteria that screens out people with disabilities.

> According to the ADA of 1990 SEC. 12112. *[Section 102]* (6) using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity.

> According to the ADA's definition of a (8) Qualified individual, The term "qualified individual" means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.

The PLAINTIFF also likely was denied employment based on the condition of newsrooms throughout the country and her history of allergies, asthma, sinus issues and lack of smell rather than considering the fact her performance and her attendance were excellent and with due care, she is able to work in a newsroom, another office or remotely.

> According to the ADA of 1990 SEC. 12112. *[Section 102]* (7) failing to select and administer tests concerning employment in the most effective manner to ensure that, when such test is administered to a job applicant or employee who has a disability that impairs sensory, manual, or speaking skills, such test results accurately reflect the skills, aptitude, or whatever other factor of such applicant or employee that such test purports to measure, rather than reflecting the impaired sensory, manual, or speaking skills of such employee or applicant (except where such skills are the factors that the test purports to measure).

The PLAINTIFF had acquired extensive knowledge and skills useful in journalism and newsroom management through experience and education. She should have been rewarded; instead she was retaliated against, and her disabilities were preyed upon in the retaliation.

Meyer v Gannett

The PLAINTIFF had produced four to five stories per week on the public schools and higher education. She also produced several series on charter schools, magnet school waitlists, standardized test scores and school accountability. She shot photos and produced about 20 videos to accompanies the articles. At no time is she told her performance was an issue; just the opposite. She had a firm command of the beat and is well respected by her peers as well as the school district and the community.

Besides this, she brought knowledge of the media and publishing industry from over 35 years of participation. In her own words, the PLAINTIFF described the following:

> "I believe GateHouse Media (now Gannett) was working against its employees, consumers, and shareholders' interests in 2019 and 2020 when it announced a de-emphasis on the more profitable print format and a focus on digital content as its primary distribution strategy, because profits suffered. This was obvious from the financial statements GateHouse prepared in advance of the merger with Gannett in 2019 and the problem continues as of this writing in 2022. I shared this information with other staffers and the Executive Editor.
>
> At a staff meeting in 2019 when GateHouse and Gannett were preparing to merge, Executive Editor Susan Catron informed the editorial staff that digital clicks would be a significant factor in our job performance evaluations. I asked whether print readership and "news judgment" used in determining editorial priorities also would be measured or considered, and she said the emphasis was on online. An overemphasis on digital clicks without regard to editorial judgment can be counterproductive to serving the public through the mission of journalism. A digital emphasis also could reduce profits, which already were declining.
>
> According to financial reports from GateHouse and Gannett, print still commanded the bulk of the company's revenue and profits when the companies were merged in November 2019, just before the PLAINTIFF's life was upended. The Gannett prospectus for investors suggested a similar financial picture, so it's peculiar newsroom employees were being asked to focus on digital. The PLAINTIFF recalls Ms. Catron said the higher-ups at the paper wanted the focus on digital. I also grew concerned about how the company was emphasizing digital to the detriment of print after some previous subscribers told me they had dropped their print subscriptions due to the high price of about $40 a month and were no longer reading as much as they had when they subscribed to the newspaper. I related my concerns about this to the publisher because many people who drop their subscriptions don't return. Many print readers don't convert to digital.

Gannett's most recent financial statements from the second quarter of 2022 reflect a continued decline in revenue and profits from prior to the merger, as the company has continued to de-emphasize print and

Meyer v Gannett

work toward pushing consumers to its digital products. The PLAINTIFF believes she was retaliated against for speaking about this. She also attempted to contact the company's ethics number, but it didn't seem to be working properly, which would be a violation of Sarbanes-Oxley. She didn't receive a response, another example of Exclusion prohibited by the ADA.

Those with disabilities should be allowed to fully participate, according to the EEOC.

The PLAINTIFF, through her extensive knowledge of the journalism rules and regulations and the media industry, could have helped the DEFENDANT avert problems that likely have caused the enormous decline in the company's net worth, which affects stockholders, customers and employees. It also affects the quality of journalism the company can produce.

**Invasions of privacy and coercion**

Federal laws such as the Health Insurance Portability and Accountability Act of 1996 (HIPAA) afford people privacy related to medical issues and disabilities. According to the Centers for Disease Control and Prevention, HIPAA created "national standards to protect sensitive patient health information from being disclosed without the patient's consent or knowledge."

Yet the DEFENDANT coerced the PLAINTIFF to agree to allow a third-party provider to dig into her background and interview neighbors and others she contacted to gather information. DEFENDANT Frankie Fort and other Gannett employees said the PLAINTIFF must sign a Consumer Reporting Background Agreement to be employed by GateHouse Media, now Gannett. The PLAINTIFF protested this requirement.

Forcing a new hire to give up her civil liberties, such as privacy, amounts to coercion, an unfair labor practice and a violation of the National Labor Relations Act, 29 U.S.C. §§ 151-169. [Title 29, Chapter 7, Subchapter II, United States Code]. The Plaintiff was a member of Working Journalists, an arm of the News Guild in Chicago.

The ADA also forbids coercion under SEC 12203 [Section 503], "Prohibition against Retaliation and Coercion." The Act forbids discriminating against an individual who has opposed an act made unlawful by the American with Disabilities Act. While the PLAINTIFF and her attorney didn't consider the ADA at the time the Consumer Reporting Background Check was presented to the PLAINTIFF, it amounts to a form of disability discrimination because the DEFENDANT treated her differently from other employees

Meyer v Gannett

in requiring the agreement. It also led the PLAINTIFF to be excluded from certain activities as people became aware the PLAINTIFF's privacy was subject to invasion.

This invasion of privacy was directly related to the PLAINTIFF's language disability because she wasn't a Conversationalist journalist, while others were. This means she didn't use the Conversation in her reporting and strived to omit language that would be confusing to the reader in the articles she wrote. The language the PLAINTIFF spoke and used in her writing was plain English, but it was different from the hidden-language double-speak others were using. They spotted her difference, or disability, and discriminated against her because of it.

The ADA of 1990 states:

> "(a) Retaliation. No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

> "(b) Interference, coercion, or intimidation. It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter."

The Act also provides for remedies when Retaliation, Interference, Coercion or Intimidation are factors in the discrimination.

> The Act states, "(c) Remedies and procedures. The remedies and procedures available under sections 12117, 12133, and 12188 of this title *[sections 107, 203 and 308]* shall be available to aggrieved persons for violations of subsections (a) and (b) of this section, with respect to subchapter I, subchapter II and subchapter III, respectively, of this chapter *[title I, title II and title III, respectively."*

The invasions of privacy the DEFENDANT, or a third party it had a relationship with, apparently engaged in became the basis of many other forms of discrimination under the ADA, such as exclusion, retaliation and harassment. The PLAINTIFF believes the DEFENDANT might have used information gathered about the PLAINTIFF as currency in the so-called Conversation without her explicit consent or permission. While she hadn't previously considered the media industry was spying on her, the possibility

Meyer v Gannett

the DEFENDANT was spying on her for years must be considered. Why else would the DEFENDANT be so concerned about getting her signature on the Consumer Reporting Background Agreement?

The hidden conversation and double-speak used in the newsroom often seems to be about the PLAINTIFF and people she knows. She hadn't previously been aware of this because of her language disability.

This presented an issue for the DEFENDANT for other reasons as well. The DEFENDANT's insistence the PLAINTIFF renew the Consumer Reporting Background Agreement in 2019, while most employees weren't asked to sign it, was a violation of Equal Protection Clauses of the ADA and Title VII of the Civil Rights Act, as the DEFENDANT failed to provide a reason for this agreement and failed to demonstrate its requirement was job related.

This agreement also struck the Plaintiff as a violation of the rules governing the profession of journalism, which allow for sources to request to speak anonymously. As a media company, Gannett should understand this.

Despite recognizing the coercion as a sign the workplace might be abusive, the Plaintiff signed the document because she wanted the job. In the Plaintiff's words:

*"It quickly became apparent the newsroom was being monitored, which I felt was a problem for journalists. I believe making this signed agreement a condition of employment constitutes an unfair labor practice and is discriminatory in and of itself. People who understand the First Amendment and the importance of privacy as it pertains to freedom of speech and freedom of the press should not be discriminated against nor retaliated against for bringing this concern about privacy to the forefront. The press cannot operate in an entirely 'free '0 manner if it is concerned about who's listening. It also should not be allowing its work to be disseminated in any form prior to publication for a variety of reasons, including basic misunderstandings, inaccuracies due to lack of verification, privacy laws governing personnel, health, trade secrets and other confidential or protected areas that might arise in the course of reporting or editing a story.*

*"As a reporter who understands the importance of privacy when interviewing people for sensitive stories, including occasionally allowing a source to go 'off the record,' I felt this form could have a chilling effect on my ability to interview people in the Savannah community as well as on my communications and relationships with neighbors, work colleagues and other residents. Personal privacy is important to me and part of my value system or personal religion. I believe it goes*

29

*hand-in-hand with the First Amendment, freedom of speech, freedom of the press and freedom of religion. I've learned as a reporter that many people decline to participate in tape-recorded interviews, while other people are less honest or forthcoming if they are aware they're being recorded. I believe the newsroom was recorded, and I believe it reduced the amount of newsroom dialogue and camaraderie among staffers. This policy contributed to what I felt at times was a toxic environment."*

*The Press also should not be allowing its work to be disseminated in any form prior to publication for a variety of reasons, including basic misunderstandings, inaccuracies due to lack of verification, privacy laws governing personnel, health, trade secrets and other confidential or protected areas that might arise in the course of reporting or editing a story.*

About a year after the Plaintiff signed the Investigative Background Check form, a Human Resources Assistant (who subsequently left the company) approached the PLAINTIFF and asked her to sign another agreement for the upcoming year. Again, the company required the document to be signed if the PLAINTIFF wanted to stay employed.

In the Plaintiff's own words, this constituted a violation of the First Amendment, which promises a Free Press.

It also was a repeated violation of the ADA, which prohibits coercion, interference, exclusion and allows for Equal Protection. It also provides for reasonable accommodations unless there is undue hardship.

Where is the undue hardship to Gannett from not requiring this document? The PLAINTIFF believes the document was used to justify the ongoing Invasion of Privacy and the Conversation, which also are violations of Equal Protection.

This privacy invasion also could involve violations of federal laws designed to prevent corporate espionage and a violation of Illinois' Eavesdropping Law as the monitoring continued while the PLAINTIFF was in her Evanston home in 2020.

The espionage also could involve copyright, as the media's content and intellectual property were involved. To the extent Gannett or the Plaintiff own the content, including interview notes, whoever is "investigating" is interfering with the rights to this property and might be infringing on copyright.

Meyer v Gannett

Copyright is one of the strongest forms of intellectual property protection afforded to writers, designers, photographers, and other creators using a written form to describe their innovations. One purpose behind copyright is to encourage others to create works for the betterment of society.

> In Article 1, Section 8, the U.S. Constitution states, Congress shall "promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries."

> Sec. 302 of the The Copyright Act of 1976 states, "Copyright in a work created on or after January 1, 1978, subsists from its creation and, except as provided by the following subsections, endures for a term consisting of the life of the author and 70 years after the author's death." https://www.copyright.gov/title17/title17.pdf

The newspaper industry's rapid decline reflects a variety of factors. One not often discussed is the practice in the broadcast news industry of taking print content and with very little modification airing it as if they created it from scratch themselves. From conferences the Plaintiff has attended, this isn't limited to one particular newsroom. The Plaintiff learned from her newsroom experience at Gannett the newsroom wasn't secure.

The PLAINTIFF became increasingly aware of the Invasion of Privacy and management issues. Given the difficult situation they created for the PLAINTIFF, she sought to use the company's internal ethics hotline to seek and provide information. It's unclear whether it was operable as she left a message but didn't hear back.

**Retaliation and Sabotage**

Part of the retaliation the PLAINTIFF experienced involved the employer sabotaging the PLAINTIFF's creative work. At some point in 2021 or 2022, for retaliatory reasons the PLAINTIFF doesn't understand, Gannett took down photos and videos the PLAINTIFF produced for the public's information and benefit, depriving the public of this content. After news is published, it continues to have historical value. Libraries keep news archives from local and national publications because they remain of scholarly interest to historians and researchers in a variety of academic disciplines, such as social studies, business and law. It's rare for a legitimate news organization to take down previously published content and replace elements, such as photos and videos, because it violates the public trust. This is another example of how the DEFENDANT went to great lengths to exclude and retaliate against the PLAINTIFF.

Many of the PLAINTIFF's videos on YouTube also were tampered with apparent acts of sabotage. Repairing them at this late date would require substantial time and effort.

Meyer v Gannett

While recovering and on unpaid leave, the PLAINTIFF updated her own website, SmallBizChicago.com, with a couple of new articles and photos, only to have it hacked with typos inserted into the posts, to the point where she had to take it down because it was damaging her reputation while she pursued other opportunities. The PLAINTIFF doesn't know who hacked the site, but it's clear her photos and videos were taken down in an act of retaliation, providing fewer work samples for her to show as she looked for work and destroying the public trust

These are violations of the ADA's Retaliation and Interference, coercion or intimidation clauses, described above, which outlaw bullying of people with disabilities. They also provide for remedies.

Other forms of retaliation were even more damaging.

**OSHA Clean Air Act**

The use of chemicals in the newsroom is not to be disputed, though it was largely covered up.

On at least one occasion in the fall of 2019 PLAINTIFF was told by DEFENDANT HR Director Frankie Fort to clear out of the newsroom because another employee "needed meth." The PLAINTIFF isn't certain the chemicals being used in the newsroom were the controlled substance methamphetamine. She witnessed a white spray or mist that seemed to descend from the ceiling above a couple of employees' work stations in November 2019.

When the PLAINTIFF was told to clear out of the newsroom, she did so.

On one occasion while doing reporting outside the newsroom, on or about Oct. 23, 2019, the PLAINTIFF detected the same chemicals at the event as she had observed in the newsroom. The PLAINTIFF had to leave this meeting because she felt ill.

The PLAINTIFF was injured physically due to her disability when chemicals were allowed in the newsroom and other substances -- not necessarily the same as those in the newsroom – were later detected in the townhouse where she lived. The newsroom contamination occurred despite laws requiring large employers to provide workers with a safe workplace without known hazards that can cause injury, illness or death. Whatever contaminants worked their way into the PLAINTIFF's physical body remained there, and her allergist told her in February2020, "You were poisoned."

The PLAINTIFF isn't certain over what period of time this exposure occurred, because of her disabilities, including lack of sense of smell. Chemicals also appeared in her belongings in late November or early

Meyer v Gannett

December 2019, when Executive Editor Susan Catron told the PLAINTIFF to pack up her belongings, and some chemical residue was found in containers when the items arrived in Evanston in 2020.

The use of chemicals in the workplace is a violation of the Occupational Safety and Health Act's General Duty Clause.

> Public Law 91-596 84 STAT. 1590 of 1970, amended in 2004, SEC 5, Duties (a), which states: Each employer (1) shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or likely to cause death or serious physical harm to his employees; (2) shall comply with occupational safety and health standards promulgated under this Act. https://www.osha.gov/laws-regs/oshact/completeoshact

**EPA Clean Air Act**

The PLAINTIFF was injured physically due to her disability when chemicals were allowed in the workplace, a violation of (a) the Environmental Protection Agency's General Duty Clean Air Act Section 112(r)(1), which "makes the owners/operators of facilities with regulated hazardous substances responsible for managing chemicals safely." https://www.epa.gov/rmp/general-duty-clause-fact-sheet#

**Other Statutes**

The PLAINTIFF also was the victim of the DEFENDANT'S alleged violations of other statutes, including

- Illinois' Eavesdropping Act as the Invasion of Privacy occurred in 2018, 2019 and 2020 while she was in Evanston,
- laws regulating Cyber stalking and Cyber Espionage, as her computer was tapped remotely during this same period,
- sabotage and destruction of creative work related to copyright law, including a website the PLAINTIFF launched years before that was hacked in early 2020 while she was still employed by the DEFENDANT and videos she produced on her own time without full compensation,
- violations of Sarbanes-Oxley, including the ethics hotline requirement, which did not seem to be working, and financial duties to shareholders, related to information the PLAINTIFF provided that foreshadowed the company's rapid decline as it stopped focusing on print advertising and circulation to grow its digital business, which hasn't materialized as forecast.

Meyer v Gannett

WHEREFORE, PLAINTIFF respectfully requests the court grant

a) immediate relief from exorbitant legal fees preventing the PLAINTIFF from obtaining suitable legal counsel

b) injunctive, equitable, compensatory, declaratory and punitive relief from the DEFENDANT'S discriminatory acts, which are in violation of the American with Disabilities Act of 1990 (ADA) and of the Act as amended in the ADA Amendments Act of 2008 (ADAAA) and other laws the DEFENDANT allegedly violated that also could have contributed to discrimination and retaliation.

c) other relief the court deems appropriate.

<div style="margin-left: 50%;">
Respectfully submitted,<br>
Ann Meyer<br>
*Pro Se*<br>
Evanston, IL<br>
847-271-0177<br>
ameyerwrtr@aol.com<br>
annmeyerann@gmail.com
</div>

Aug. 14, 2022